**Samantha J. COMFORT,
et. al., Plaintiffs,**

**v.**

**LYNN SCHOOL COMMITTEE,
et al., Defendants,**

**and**

**Commonwealth of Massachusetts,
Defendant–Intervenor.**

**No. 99–11811–NG.**

United States District Court,
D. Massachusetts.

June 29, 2001.

Chester Darling, Boston, MA, for plaintiffs.

John C. Mihos, Lynn, MA, for The Lynn School Committee, Patricia Capano, Frank M. Carrabba, Steven F. Duffy, George Mazareas, William McDonald, Timothy McManus, James Mazareas.

John R. Hitt, Attorney Generals Office, Government Bureau, Boston, MA, for Commonwealth of Massachusetts.

Ross Wiener, U.S. Department of Justice, Educational Opportunities Section, Washington, DC, for USA.

George S. Markopoulos, Assistant City Solicitor, Lynn, MA, for City of Lynn and Patrick J. McManus.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

The plaintiffs, parents of students residing in Lynn, Massachusetts, challenge the validity of the Lynn "Voluntary Plan for School Improvement and the Elimination of Racial Isolation" [hereinafter "the Lynn Plan"] and the Massachusetts Racial Imbalance Act. They contend that the consideration of race, both in limiting a student's ability to transfer out of a neighborhood, or "district," school under the Lynn Plan and in regulating the allocation of state education funding under the Racial Imbalance Act,[1] violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964, as well as various Massachusetts constitutional and statutory provisions. They petition this Court to invalidate the Lynn Plan and enjoin the defendants from employing racial classifications in student assignments and the distribution of state aid.[2]

1. The implementation of the Lynn Plan qualifies the Lynn Public Schools for certain additional educational aid from the Commonwealth of Massachusetts.

2. Specifically, the plaintiffs entreat this Court to:

(1) Declare M.G.L. c. 71, § 37D to be in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article III of the Amendments to the Massachusetts Declaration of Rights;

(2) Declare that the defendants violated the constitutional rights of the plaintiffs in violation of 42 U.S.C. §§ 1981 and 1983;

(3) Declare that the defendants violated the plaintiffs' rights against discrimination via a program that receives federal funding under 42 U.S.C. § 2000d (Title VI);

(4) Declare that the defendants violated the plaintiffs' rights by denying "admittance to a public school on the basis of race, color, national origin or creed" under Article III of the Amendments to the Massachusetts Declaration of Rights;

Two parents remain as plaintiffs in the action—Samantha J. Comfort ("Comfort") on behalf of her daughter Elizabeth Neumyer ("Neumyer") and Karen Agnew ("Agnew") on behalf of her daughter Shavon Danielle Baskerville ("Baskerville")—after this Court endorsed an order on January 9, 2001, granting the motion to voluntarily dismiss plaintiffs Rhonda Campbell, Andrew DiGaetano, and Cattibell DiGaetano.

The Commonwealth of Massachusetts, the defendant-intervenor in this case, now renews its earlier Motion to Dismiss the plaintiffs' First Amended Complaint on the following two grounds:[3] (1) The remaining plaintiffs, who have not sought to transfer their children to other schools for the 2000–2001 school year, lack standing to continue to prosecute this case, and, (2) the plaintiffs' challenge to Mass.G.L. c. 71 § 37D fails to state a claim upon which relief can be granted.[4] The City of Lynn, the Lynn School Committee, as well as Patrick J. McManus, the Mayor of Lynn ("Mayor McManus"), James Mazareas, the Superintendent of the Lynn Public Schools ("Superintendent Mazareas"), and the members of the Lynn School Committee named in the complaint[5] [hereinafter referred to collectively as "the Lynn defen-

dants"] have joined in the Commonwealth's renewed Motion to Dismiss.

Though neither of them has requested a transfer nor intimated that they intend to do so, the plaintiffs contend that they have standing to bring this action because they are likely to face further application of racial restrictions in future transfer requests or if the schools they currently attend should become over-subscribed.

■ However, the mere possibility of future harm, without some compelling evidence of susceptibility or inevitability, does not satisfy Article III standing requirements for injunctive relief to issue. As the plaintiffs have failed to augment the record with allegations that demonstrate a realistic threat of future injury, their speculations in the abstract alone cannot sustain this Court's jurisdiction.

Nevertheless, even absent a showing of actual damages or imminent future harm, a litigant may have standing to seek nominal damages as long as he or she can establish unconstitutional treatment. On the truncated record before me and without further evidentiary hearings, I conclude that the plaintiffs allege adequate proof of unequal treatment based on race and, therefore, have standing to seek nom-

(5) Enjoin the defendants from continuing to discriminate on the basis of race or from rewarding/encouraging discrimination by making racial balancing a pre-condition for the receipt of state education aid;

(6) Order the defendants immediately to initiate a race neutral student assignment process and allow those students who have been discriminated against to transfer to the schools they seek; and,

(7) Award nominal damages, "other relief that is just and appropriate," attorneys' fees and costs.

3. On February 12, 2001, this Court granted the earlier motion, filed on November 17, 2000, dismissing all the plaintiffs' claims against the Commonwealth and allowing the Commonwealth to remain in the action for

the limited purposes of defending the constitutionality of the Massachusetts Racial Imbalance Act. *See Comfort ex rel. Neumyer v. Lynn School,* 131 F.Supp.2d 253 (D.Mass.2001) [hereinafter *"Comfort II "*].

4. Section 37D is one section of a larger statute referred to as The Massachusetts Racial Imbalance Act, originally enacted in 1965.

5. Sued in their official capacity only, they are: Patricia Capano ("Capano"), Frank M. Carrabba ("Carrabba"), Steven F. Duffy ("Duffy"), George Mazareas ("Committee Member Mazareas"), William McDonald ("McDonald"), and Timothy McManus ("Committee Member McManus").

inal damages and limited declaratory relief.

Accordingly, for the reasons stated below, the defendants' Renewed Motion to Dismiss [docket entry # 84] is **GRANTED** in part and **DENIED** in part.

# I. *PROCEDURAL POSTURE*

In my earlier decision dismissing the plaintiffs' claims against the Commonwealth, I did not address the issue of standing in part because the Lynn defendants did not join in the original Motion to Dismiss filed by the Commonwealth.[6] Once this Court had determined that the plaintiffs' claims against the Commonwealth could not stand, the Commonwealth remained a party in the narrow capacity under 28 U.S.C. § 2403(b) to defend the constitutionality of the Massachusetts Racial Imbalance Act.[7] As a party by virtue of section 2403(b) rather than Rule 24(b)(2) of the Federal Rules of Civil Procedure,[8] the Commonwealth's participation in this case is limited to "presentation of evidence" and "argument on the question of constitutionality"; it may not, however, invoke the full arsenal of procedural tools at the disposal of an ordinary party-litigant, such as motions to dismiss under Fed.R.Civ.P. 12(b).[9] *See Ruotolo v. Ruotolo*, 572 F.2d 336, 338–39 (1st Cir.1978) (there is a difference between limited intervention to defend constitutional issues and intervention as a full-status litigant where the "government must possess some independent basis as party apart from its status as intervenor"). In other words,

---

**6.** Despite the Commonwealth's claim to the contrary, the docket reflects that the Lynn defendants never joined in the original Motion to Dismiss of the Commonwealth. Moreover, at a January 19, 2001 hearing held by this Court on the Commonwealth's Motion to Dismiss, only counsel for the plaintiffs and the Commonwealth, but none representing the Lynn defendants, participated.

**7.** Section 2403(b) provides:
In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

**8.** Fed.R.Civ.P. 24(b)(2) governs permissive intervention. That section provides, in pertinent part:

Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

**9.** The Commonwealth could not have intervened in this action under Fed.R.Civ.P. 24(b). A successful applicant under Rule 24(b)(2) must demonstrate a "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Equal Employment Opportunity Comm. v. National Children's Ctr.*, 146 F.3d 1042, 1046 (D.C.Cir.1998) (citations omitted). Here, the Commonwealth does not have an independent basis for subject matter jurisdiction. Furthermore, permitting the Commonwealth to intervene as a full party under Rule 24(b) would not have been appropriate because of the undue delay and complications their intervention would add to an already complex litigation. *See* Fed.R.Civ.P. 24(b)(2) ("In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties").

because the Lynn defendants did not participate in the original Motion to Dismiss, the Commonwealth alone lacked a proper basis to move to dismiss the action on the ground that the plaintiffs lack standing to prosecute.

Furthermore, I did not previously address the standing arguments because I contemporaneously granted, in part, the plaintiffs' motion to amend their complaint to the extent that they sought to add six additional plaintiffs and to revise their challenge to the Racial Imbalance Act.

However, rather than file an amended complaint by the deadline imposed by this Court, counsel for the plaintiffs filed a second action, *Bollen, et al v. Lynn School Comm., et al,* No. 01CV–10265–NG (February 28, 2001), on behalf of the same six plaintiffs they had sought to add here.[10]

The current state of the pleadings in this case is, therefore, that the plaintiffs' claims remain against the Lynn defendants. The Commonwealth remains a defendant-intervenor in the case for the limited purpose of defending the Racial Imbalance Act. The Lynn defendants, together with the Commonwealth, now jointly renew[11] the Commonwealth's Motion to Dismiss and incorporate by reference the arguments related to standing and the Racial Imbalance Act previously asserted by the Commonwealth in the memorandum of law that accompanied the earlier motion.

## II. FACTS

### A. The Plan

This action for declaratory and injunctive relief, as well as nominal damages, was brought on August 30, 1999, originally by five parents of students challenging the Lynn Plan.[12] Under the plan, all students in the Lynn Public School system are guaranteed the right to attend their neighborhood school and the right to request a transfer to a non-neighborhood school.[13] In general, transfers are allowed except where they would increase racial isolation (too low a minority percentage) or racial imbalance (too high a minority percentage) in the particular schools involved.[14]

The Lynn Plan determines eligibility for transfer rather than the outcome of any particular request. Exceptions may be

10. After foregoing the option of filing an amended complaint and instead instituting an entirely separate action, the plaintiffs moved on April 4, 2001 to consolidate the two actions. I address the motion to consolidate in a separate order.

11. I agree with the plaintiffs that technically the Lynn defendants are inaccurate when they claim to be "renewing" a motion to dismiss that they never filed or joined in the first place. Nevertheless, as did the plaintiffs in opposing the defendants' arguments on the merits, I construe this motion simply as the initial motion to dismiss filed in this action by the Lynn defendants.

12. On December 14, 1999, this Court granted the plaintiffs leave to file an amended complaint, which added the Commonwealth as a party-defendant.

13. According to statistics provided by the Massachusetts Department of Education, the Lynn Public Schools educate approximately 15,000 students in Kindergarten through Twelfth grade. Lynn operates nineteen elementary schools, six middle/junior high schools, and six high schools. The student body is a racially diverse group, consisting of approximately 45% Whites, 26% Latino–Americans, 15% African–Americans, 14% Asian–Americans, and .4% Native Americans. *See generally* http://profiles.doe.mass.edu.

14. Under the Lynn Plan, elementary schools are considered "racially balanced" if the minority enrollment is within 15 percent of the district-wide minority enrollment. Middle and high schools are considered "racially balanced" if the minority enrollment is within 10 percent of the district-wide minority enrollment.

granted for hardships involving concerns about siblings attending the same school, safety, medical needs, and, as of 1999, hardships resulting from day care situations and classification of bi-racial and multi-racial students under the plan. Furthermore, the Lynn Plan affords parents an opportunity to appeal a denial of a transfer request.

Once a student successfully transfers to a non-neighborhood school, the student is automatically reassigned to that school for the following year. However, if the school were to become oversubscribed, administrators overseeing the Lynn Plan would consider race as one factor in determining which students would be required to attend another school.

### B. *The Plaintiffs*

On March 30, 1999, plaintiff Samantha Comfort visited the Parent Information Center ("PIC"), a school registration and assignment center at the Lynn Public School Administration, to request for her daughter an out-of-district kindergarten placement at the Shoemaker Elementary School.[15] The PIC denied Comfort's request because the Shoemaker School was more racially isolated than her district school.[16]

In a letter dated May 14, 1999, Comfort expressed to Superintendent Mazareas her indignation at Lynn's race-based transfer policy and complained about the denial of her request for her daughter to be assigned to the Shoemaker School, rather than her district school, because of the location of her day care provider.

Superintendent Mazareas forwarded the letter to the PIC, which treated the letter as an appeal under the student assignment plan.[17] Elizabeth Neumyer was temporarily assigned to the Sewell–Anderson Elementary School, pending the final determination on the appeal.

On June 7, 1999, Comfort notified the PIC that she had changed Elizabeth's day care provider to a location in the Sisson Elementary School district and requested her daughter's assignment to the out-of-district Sisson School. The PIC denied Comfort's request because the Sisson Elementary School was more racially isolated than her district school.

A few weeks later, Comfort renewed her transfer request to the Sisson School, which was subsequently denied by a staff-worker at the PIC who allegedly informed Comfort that if her daughter were a student of color, she would be able to attend her preferred out-of-district school.

Comfort made a series of phone calls on behalf of her daughter to City Counselor Rick Ford ("Ford"), as well as Lynn School Committee members Mazareas and Carrabba. Carrabba allegedly advised Comfort that the student assignment policy was mandated by state law and that due to minority percentages, transfer to the Sisson School was an option not available to her daughter.

On July, 29, 1999, Comfort mailed letters, certified return receipt, to: Mayor McManus, Committee Member McManus, Superintendent Mazareas, Committee Member Mazareas, Ford, Carrabba, Capano, Duffy, and McDonald. Each delivery

---

**15.** Comfort and her daughter then resided at 201 Linwood Street which is located in the Sewell–Anderson School district.

**16.** According to the school enrollment forms, Comfort has classified her daughter's race as White.

**17.** *See* Second Affidavit of Janet F. Birchenough ("Birchenough"), Director of the PIC for the Lynn School Department, January 28, 2000 [hereinafter "Second Birchenough Aff."] at ¶ 14.

contained a copy of the May 14, 1999, letter originally mailed to Superintendent Mazareas and a personal letter individually directed to each recipient complaining about Lynn's transfer policies.

On August 2, 1999, Comfort called Committee Member Duffy, who advised the plaintiff of her right to appeal the decision denying her transfer request. On August 3, 1999, Comfort contacted the Governor's office as well as several other Lynn School Committee members.

On August 5, 1999, Comfort visited Superintendent Mazareas' office to obtain a copy of the Lynn student assignment policy. She later spoke to Superintendent Mazareas by telephone about her appeal.

Comfort returned home later that same day to discover a message on her answering machine from Superintendent Mazareas informing her that her appeal had been granted and her transfer request for her daughter approved. Superintendent Mazareas granted the appeal because of Comfort's extreme hardship as a single parent working in Boston with day care complications.

As a result, Elizabeth currently attends first-grade at the Sisson Elementary School, her desired placement. Comfort has not requested a transfer for her daughter for the 2000–2001 school year.[18]

Plaintiff Agnew is the mother of Shavon Danielle Baskerville. At her mother's request, Shavon attended Cobbett Elementary School, her district school, through grade five. For the 1998–1999 school year, Shavon's 144 Lawton Avenue residence was in the Pickering Middle School district, which offers grades six through eight.

A new school, the Lynn Classical Middle School, was scheduled to open in September of 1999. In the initial redistricting, most Cobbett Elementary students were assigned to Lynn Classical Middle, with a smaller number of students assigned to the Marshall and Pickering Middle Schools. The PIC mailed letters of assignment to Lynn parents in May of 1999, and Shavon Baskerville was designated for the Pickering Middle School, her district school.

On June 17, 1999, Agnew visited the PIC to request an out-of-district assignment for her daughter to Lynn Classical Middle School. The PIC denied Agnew's request because Pickering was a racially isolated school[19] and because the Lynn Classical Middle School had already been oversubscribed, with all space assigned to district students and to out-of-district students who had requested an assignment to the school by May of 1999. Agnew was told that a waiting list had been established for enrollment to the newly opened school.

Thereafter, Agnew informed a registrar at the PIC that she intended to move her residence into the Lynn Classical Middle School district. On the same day, Agnew appealed the PIC's denial of her assignment request. The PIC deferred ruling on Agnew's appeal because, pending Ag-

18. *See* Answers of the plaintiffs Comfort and Agnew to the Commonwealth's interrogatory no. 19, attached to the Memorandum in Support of the Commonwealth's initial Motion to Dismiss ("[t]he plaintiffs have not and do not intend to seek a transfer from the school to which they are currently assigned ... because the Lynn defendants have already given them a transfer to their school of choice"); *see also*

Third Affidavit of Birchenough, November 1, 2000 [hereinafter "Third Birchenough Aff."] at ¶ 8, 9 ("Comfort has not requested a transfer for Elizabeth for the 2000–2001 school year").

19. According to the school enrollment forms, Agnew has classified her daughter's race as Black.

new's anticipated move, her daughter would be assigned automatically to her district school, Lynn Classical Middle.

On August 17, 1999, Agnew came to the PIC and presented documents showing that she and her daughter had moved in July, 1999, to 44 Arlington Street, which was in the Lynn Classical Middle School district. Consequently, Shavon was assigned to the appropriate district school, thereby making it unnecessary for the PIC to address Agnew's appeal of her denied transfer request.

As a result, Shavon currently attends seventh-grade at the Lynn Classical Middle School, her district school, as requested by her mother. Agnew has not requested a transfer for her daughter for the 2000–2001 school year.[20]

### C. *The Preliminary Injunction*

In December of 1999, anticipating the beginning of the student assignment process for the 2000–2001 school year, the plaintiffs brought before this Court an application for a preliminary injunction to enjoin the Lynn defendants from using race or ethnicity in any phase of school selections, school assignments, seat allocations, student transfers, and wait listing and requiring the Lynn defendants to design and implement a race-neutral program whereby students may freely transfer to schools closer to their homes. Furthermore, the plaintiffs sought a preliminary injunction requiring the Commonwealth of Massachusetts to eliminate the consideration of race in disbursing state education funds.[21]

This Court denied the applications for preliminary injunction both because the plaintiffs did not demonstrate a threat of irreparable harm and because their likelihood of success on the merits was, at that early stage in the litigation, unclear. *See Comfort ex rel. Neumyer v. Lynn School Committee*, 100 F.Supp.2d 57, 60 (D.Mass. 2000) [hereinafter "*Comfort I* "].

### III. *LEGAL DISCUSSION*

#### A. *Plaintiffs' Standing to Prosecute this Action*

##### 1. *Evidentiary Standard*

 Litigants who seek to invoke the jurisdiction of the federal courts must satisfy Article III's threshold case or controversy requirement by demonstrating that they have standing to bring the case, namely a personal stake in its outcome.[22] *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The issue is, therefore, properly brought

---

**20.** *See* Answers of the plaintiffs Comfort and Agnew to the Commonwealth's interrogatory no. 19, attached to the Memorandum in Support of the Commonwealth's initial Motion to Dismiss ("[t]he plaintiffs have not and do not intend to seek a transfer from the school to which they are currently assigned ... because the Lynn defendants have already given them a transfer to their school of choice"); *see also* Third Birchenough Aff. at ¶ 13 ("Agnew has not requested a transfer for Shavon for the 2000–2001 school year").

**21.** The plaintiffs filed separate applications for a preliminary injunction against the Lynn defendants on December 9, 1999, and against the Commonwealth on December 28, 1999.

**22.** In addition to its constitutional dimension, standing doctrine encompasses prudential considerations regarding the proper exercise of federal jurisdiction. To that effect, courts are directed to refrain from adjudicating "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citations omitted).

under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501, (1986) (classifying a defect of standing as a defect in a court's subject matter jurisdiction); *see also* Erwin Chemerinsky, *Federal Jurisdiction* §§ 2.1, 2.3 (1994); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure, Civil* 2d, § 3531.15, at 95 n. 9 (2d ed.1984).[23]

As with all motions to dismiss brought under Fed.R.Civ.P. 12, I accept as true all material allegations of the complaint and draw all reasonable inferences in favor of the complaining party. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). At the same time, because federal courts have limited jurisdiction, in 12(b)(1) proceedings the party invoking a federal forum has the burden of demonstrating the existence of federal jurisdiction. *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.1995). Furthermore, it is within a court's discretion to make "appropriate inquiry" beyond the pleadings to "satisfy itself on authority to entertain the case." *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 362–63 (D.C.Cir.1982) (citations omitted); *see also Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("[W]hen a question of the District Court's jurisdic-

tion is raised, either by a party or by the court on its own motion, . . . the court may inquire, by affidavits or otherwise, into the facts as they exist"). If a plaintiff's standing does not adequately appear from all materials of record, including amendments to the complaint or affidavits, the complaint must be dismissed. *Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

### 2. *Elements of Standing*

■ The standing determination hinges on whether a plaintiff has alleged a sufficient personal interest in the outcome of a controversy to justify a federal court exercising its remedial authority on their behalf. Conceptually, a plaintiff has a personal stake only where he himself has suffered some actual or threatened injury as a result of the alleged illegal action. *See Warth*, 422 U.S. at 498–99, 95 S.Ct. 2197 (citations and internal quotation marks omitted).

■ Generally, to clear the Article III standing hurdle, an individual plaintiff has the burden of showing: (1) That he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely specula-

---

**23.** A motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) may be considered at any stage of the proceeding. For that reason, despite having filed their answer to the First Amended Complaint more than a year ago on December 2, 1999, the Lynn defendants may now join in the Commonwealth's motion. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"). In fact, even if the parties do not raise the question of lack of jurisdiction, it is the duty of a federal

court to determine the matter *sua sponte* because the resolution of the standing issue bears directly on the constitutional power of a court to decide the controversy at all. *Atlas Life Insurance Co. v. W.I. Southern Inc.*, 306 U.S. 563, 59 S.Ct. 657, 83 L.Ed. 987 (1939). For this reason, a defect in jurisdiction cannot be waived any more than proper jurisdiction may be conferred upon a federal court by consent, inaction or stipulation of the parties. *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *United States v. AVX Corp.*, 962 F.2d 108, 116 n. 7 (1st Cir. 1992).

tive, that the injury will be redressed by a favorable decision.[24] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Moreover, a plaintiff must demonstrate standing separately for each form of relief sought. *See Mack v. Suffolk County,* 191 F.R.D. 16, *19 (D.Mass.2000).

■ The fact that the plaintiffs in this case may also seek to represent a class does not affect my standing inquiry because class representatives must show that they themselves *personally* have been injured, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth,* 422 U.S. at 502, 95 S.Ct. 2197; *see also In re Bank of Boston Corp. Securities Litigation,* 762 F.Supp. 1525, 1531 (D.Mass.1991) (citing *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981) ("Standing cannot be acquired through the back door of a class action")).[25]

### 3. *Standing to Claim Injunctive Relief*

■ A plaintiff may seek injunctive relief only if he can demonstrate either actual present harm or a likely danger of direct injury in the future. *See generally Whitmore v. Arkansas,* 495 U.S. 149, 155–

58, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (harm alleged must be either presently ongoing or "certainly impending"); *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 498 n. 12 (1st Cir.1992) (citing *Lopez v. Garriga,* 917 F.2d 63, 67 (1st Cir.1990) (an injunction will not issue without a showing of a "likelihood of future unlawful conduct on the defendant's part")).

■ Past exposure to illegal conduct, unaccompanied by lingering adverse effects or a sufficient likelihood of imminent harm, is not sufficient by itself to confer standing upon a litigant to obtain equitable relief. *See Lyons,* 461 U.S. at 104–06, 103 S.Ct. 1660; *O'Shea v. Littleton,* 414 U.S. 488, 496–97, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.8 at 374 (Supp.1999).

Specific to the equal protection context, "injury in fact" with respect to claims for injunctive relief is the "inability to compete on an equal footing." In *Texas v. Lesage,* 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (*per curiam* ), the Supreme Court confirmed the precedent established under *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)[26] and *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115

---

**24.** Despite its importance for federal courts, the doctrine remains "a morass of imprecision," *New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 12 (1st Cir.1996), one "not easily susceptible to concrete definitions or mechanical application." *AVX Corp.,* 962 F.2d at 113; *see also Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (dubbing standing a "concept of uncertain meaning and scope").

**25.** Though courts have allowed class actions to continue despite the fact that the claims of

the named plaintiffs became moot after the class was certified, *Sosna v. Iowa,* 419 U.S. 393, 401, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), the doctrine is here inapplicable because no class has yet been certified.

**26.** *Northeastern Florida Contractors* held that a non-minority contractor challenging a "set-aside" program could establish injury in fact by showing that it was denied the opportunity to compete.

S.Ct. 2097, 132 L.Ed.2d 158 (1995) [27] that a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question were race not considered. Rather, in such cases, the relevant injury is competitive disadvantage, where a governmental barrier has made it more difficult for members of a group to compete for a benefit on equal footing. *See Lesage,* 528 U.S. at 19, 120 S.Ct. 467; *see also Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 280–81, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (finding that an applicant for medical school had standing to challenge the university's affirmative action program when he was not permitted to compete for all 100 places in the entering class simply because of his race).

■ Comfort and Agnew contend that their children suffered past injury at the hands of the defendants when, prior to the commencement of this litigation, they were denied school transfers on the basis of race. In addition, they maintain that their children face a credible threat of future harm under the Lynn Plan should they again seek to transfer or should a child who improves "racial balance" apply to transfer and displace either Elizabeth or Shavon from their current school assignment.

On the basis of this record, however, it is far from clear that the plaintiffs can be said to have suffered any past injury at the hands of the defendants. Though the parties concede that at one point Elizabeth Neumyer and Shavon Baskerville were denied a transfer request under the Lynn Plan and that the denial of the transfer requests took the race of each child into account, both Elizabeth Neumyer and Shavon Baskerville nevertheless obtained their desired school placements before the start of the school year pursuant to the Lynn Plan itself.

Notwithstanding injuries allegedly suffered predating this lawsuit, the threat of a future inability to compete on equal footing is far too speculative and remote to establish the requisite interest for an injunction to issue. At the time they filed their complaint, both remaining plaintiffs had already received their desired placements.[28] Since that time, neither plaintiff has sought a transfer nor evidenced any dissatisfaction with their children's current school assignments. In fact, to the contrary, the plaintiffs have expressly indicated in their answers to the Commonwealth's interrogatories that they do not intend to apply for a transfer for the upcoming school year.

Furthermore, as the children currently attend their schools of choice, the Lynn Plan makes it highly improbable that they will be displaced from those schools in the future. With respect to Elizabeth Neumyer, a student currently attending her preferred out-of-district Sisson Elementary School, once a transfer is approved, a student has a right to remain in an out-of-district school in virtually every case.[29]

---

**27.** In *Adarand,* the Supreme Court found that a firm that was low bidder on a highway construction subcontract had standing to challenge the government policy that awarded bonus payments to the general contractor for giving preference to a minority-controlled competitor—the injury was the discriminatory classification that prevented the plaintiff from competing on an equal footing.

**28.** Comfort's appeal was granted on August 5, 1999, while Agnew's transfer request was granted on August 17, 1999, after she presented documents confirming her change of residence. The complaint was first filed on August 30, 1999.

**29.** *See* Lynn Plan at 43 ("Students who transfer shall be guaranteed assignment to their new school in subsequent years"); *see also* First Affidavit of Birchenough, January 28,

Likewise, with respect to Shavon Baskerville, a student currently attending her preferred Lynn Classical Middle School, the Lynn Plan guarantees her the right to remain at her district school.[30] Significantly, neither plaintiff has introduced any evidence to suggest that their current school assignment is especially vulnerable to change because of over-subscription or evolving demographics.

The fact that one day Comfort or Agnew *may* apply for a transfer for their children or that one day their daughters' current placements *may* become more vulnerable is not enough to demonstrate a likely danger of competitive disadvantage. "Such 'one day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130 (citations omitted).[31]

Consequently, because to demonstrate a credible risk of future harm, "discouragement based on negative past experiences is not enough," *Boston's Children First v.*

*City of Boston,* 62 F.Supp.2d 247, 250 n. 6 (D.Mass.1999), I find that the plaintiffs lack standing to bring a claim for injunctive relief. *E.g. Lujan,* 504 U.S. at 563, 112 S.Ct. 2130 (holding that the intentions of various individuals represented by the plaintiffs to someday return to wildlife habitats did not assert sufficiently imminent injury to satisfy the standing requirement); *Lyons,* 461 U.S. at 101, 103 S.Ct. 1660 (possibility that plaintiff would again be subjected to illegal choking behavior by police insufficient to show immediate danger of direct injury); *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669 (dismissing a case where a class of plaintiffs sought to enjoin a magistrate and judge from utilizing allegedly discriminatory sentencing procedures because, although particular class members had actually suffered from the alleged unconstitutional practices, there was no real and immediate threat that they would again be subjected to the improper practices).[32]

 The plaintiffs correctly note the general Article III mootness principles that "voluntary cessation of allegedly ille-

---

2000 [hereinafter "First Birchenough Aff."] at ¶ 57 (Under the Lynn Plan, where an out-of-district student desires to continue to attend the school he or she attended the previous school year, re-registration is unnecessary and the student is automatically assigned to the same school for the next year, subject to space availability).

**30.** *See* First Birchenough Aff. at ¶¶ 15, 19 (Since 1988, under the Lynn Plan, "all parents and guardians of regular education students have had their children assigned to their district schools, when requested").

**31.** *Compare Mack,* 191 F.R.D. at *19, in which this Court found that the plaintiff had standing to bring an action to enjoin a county jail strip-search policy. In *Mack,* the plaintiff had a criminal record, which made it more likely that she would be arrested again. As the county strip-search policy applied to every woman detained, the plaintiff faced a very

real and immediate possibility of being subjected to future strip-searches.

**32.** Having found that the plaintiffs fail to demonstrate an immediate or likely threat of future harm, I need not address the second and third prongs of standing, redressability and causation. Nevertheless, for purposes of clarity, I note that the plaintiffs have not shown that their alleged injury is likely to be redressed by a favorable decision of this Court. Indeed, even if I concluded that the Lynn plan is unconstitutional, a modified school assignment plan that was completely race-neutral would not necessarily permit students to apply for out-of-district transfers at their discretion. Furthermore, assuming that a newly devised race-neutral plan did. allow for some latitude in transfer policy, the plaintiffs might nevertheless be precluded from their desired placement if their preferred schools were oversubscribed.

gal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot," *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), and that courts may review otherwise moot disputes that are capable of repetition, yet evading review. *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

However, the plaintiffs' reliance on the mootness doctrine misses the point. Though related under the Constitution's case-or-controversy limitation on federal judicial authority, the inquiries into mootness and standing differ in the following critical respect: a party has standing if a justiciable controversy exists when litigation begins, whereas mootness concerns whether a justiciable controversy once existed but no longer remains. *See Becker v. Federal Election Com'n*, 230 F.3d 381, 386 n. 3 (1st Cir.2000).

Therefore, the fact that the defendants may have tendered concessions to the plaintiffs *after* these proceedings were commenced or that the dispute is capable of repetition yet evading review will not entitle the plaintiffs to a federal judicial forum if they lacked standing *at the time the action started. See Laidlaw*, 528 U.S. at 180, 120 S.Ct. 693; *Renne v. Geary*, 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) ("the mootness exception for disputes capable of repetition yet evading review ... will not revive a dispute which became moot before the action commenced").

Moreover, this is not a case where the defendants voluntarily ceased their purportedly illegal conduct with respect to the plaintiffs because Elizabeth Neumyer and Shavon Baskerville received their desired placements pursuant to the provisions of the challenged Lynn Plan itself. In fact, that same challenged and allegedly unconstitutional plan is still being implemented and enforced by the defendants at this time, and the plaintiffs remain subject to its provisions throughout the remainder of their elementary and middle school years.

Nor is this a dispute capable of repetition yet evading review. This exception to the mootness doctrine has been limited to cases where there was a "reasonable expectation" that the same complaining party would be subjected to the same challenged action again. *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). In this case, however, as detailed in my previous discussion, the plaintiffs have failed to show any likelihood that they will suffer adverse consequences in the future pursuant to the disputed student assignment plan. Moreover, nothing prevents the plaintiffs from bringing an action *should they* subsequently apply and, on the basis of race, be denied a transfer to a desired out-of-district school.

### 4. *Standing to Claim Nominal Damages*

 Though the plaintiffs do not have standing to seek prospective equitable relief, this Court may properly invoke its jurisdiction to hear the plaintiffs' claims for nominal damages.[33] Nominal damages

---

**33.** The complaint includes a specific request only for nominal rather than compensatory damages. As such, this is not a case where I must determine whether a general, boiler-plate prayer for "such further relief as this court deems just and proper" operates to preserve a request for damages in order to avoid a jurisdictional defect. *See* First Amended Complaint at 23. *Compare Arizonans for Official English v. Arizona*, 520 U.S. 43, 69, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (declining to revive an otherwise moot case based on a claim for nominal damages from a general prayer for relief); *Fox v. Board*

may be available in § 1983 actions alleging a violation of constitutionally protected rights, even without proof of any actual injury. *E.g. Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (approving an award of nominal damages to a student who, though suffering no actual injury, had been suspended without an opportunity to respond to the charges against him in violation of his procedural due process rights); *Irish Lesbian and Gay Organization v. Giuliani*, 143 F.3d 638, 651 (2nd Cir.1998) (Irish lesbian and gay organization, prevented from conducting a parade before the annual St. Patrick's Day parade, had standing to bring suit for nominal damages against the mayor of the City of New York under § 1983 if they could prove discrimination even without demonstrating actual injury); *Petit v. City of Chicago*, 31 F.Supp.2d 604 (N.D.Ill.1998) (white police officers who would not have been promoted to sergeant even in the absence of challenged race-based practices had standing to seek nominal damages); *Suss v. American Society for Prevention of Cruelty to Animals*, 823 F.Supp. 181, 191 (S.D.N.Y.1993) (even if a party is unable to show any significant financial loss, nominal damages sufficient

to support standing may be found if a Fourth Amendment violation is shown).

The reason that claims brought under 42 U.S.C. § 1983 do not always [34] require a showing of actual injury is because the statute was enacted primarily as an enforcement mechanism of the Fourteenth Amendment to provide remedies at law and in equity for constitutional deprivations committed through state action. *See generally Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (detailing the legislative history of 42 U.S.C. § 1983). Though sounding in the common law of tort, 42 U.S.C. § 1983, with its broad remedial powers, seeks first and foremost to remedy injuries to individual rights, injuries that occur at the moment someone is deprived of life, liberty, or property without due process of law or denied the equal protection of the laws.[35] *See Wilson v. Garcia*, 471 U.S. 261, 278, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). As the Supreme Court explained in *Owens v. Okure*, 488 U.S. 235, 250 n. 11, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989):

> Section 1983 was the product of congressional concern about the Ku Klux Klan-

*of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 141–2 (2d Cir.1994) (rejecting claim for damages based on general prayer for relief proffered to save a case from mootness).

**34.** Some § 1983 actions, for example those brought to remedy Eighth Amendment violations, *do* require a showing of actual injury. *E.g. Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (in evaluating an Eighth Amendment claim for excessive use of force courts should consider the extent of injury inflicted); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (to state a cognizable Eighth Amendment claim based on medical mistreatment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs").

**35.** Nevertheless, in some contexts, courts have analogized and applied established tort law principles to section 1983 actions. *E.g. Smith v. Wade*, 461 U.S. 30, 34, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (looking "to the common law of torts (both modern and as of 1871)," the Supreme Court held that an official may be liable for punitive damages under section 1983 when the defendant is motivated by evil motive or intent, or acts with reckless or callous indifference to the federally protected rights of others); *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (holding that the same public policy considerations that underlie the common law rule of absolute immunity for prosecutors apply to suits brought under § 1983, and noting that "[section 1983] creates a species of tort liability").

sponsored campaign of violence and deception in the South, which was denying decent citizens their civil and political rights ... Although these violent acts often resembled the torts of assault, battery, false imprisonment, and misrepresentation, § 1983 was not directed at the perpetrators of these deeds as much as at the state officials who tolerated and condoned them. (citations omitted).

In *Carey*, for example, the plaintiffs introduced no evidence to prove damages, and no finding was made in the district court as to whether they would have been suspended even if they had been afforded procedural due process. *Carey*, 435 U.S. at 252, 98 S.Ct. 1042. Regardless, the Court found that the plaintiffs would be entitled to nominal damages even in the absence of direct proof of injury stemming from the alleged unconstitutional conduct because of "the importance to organized society that ... rights be scrupulously observed." *Id.* at 266, 98 S.Ct. 1042; *see generally Shaheed–Muhammad v. Dipaolo*, 138 F.Supp.2d 99, 105–06 (D.Mass.2001) (detailing a host of intangible rights protected by the Constitution that can be violated without concurrent physical harm).

However, in the equal protection context, there is some ambiguity after *Lesage* as to whether a challenger, to meet the Article III standing requirements to claim nominal damages under § 1983, must show that, but for the consideration of race, he would have actually received a particular benefit.[36] In *Lesage*, the Supreme Court held that a plaintiff could not recover dam-

ages because he was denied admission to a graduate school under a race-conscious admissions process, since it was established that the plaintiff would have been denied admission under a race-neutral admissions process. 528 U.S. at 20–22, 120 S.Ct. 467. Thus, after *Lesage*, standing to claim compensatory relief requires a plaintiff to show that he would receive the benefit in question were race not considered, whereas to claim equitable relief, a showing of inability to compete on an equal footing will suffice.

However, the *Lesage* Court did not expressly consider whether the "same decision defense" precludes the possibility of nominal damages. Lesage filed suit seeking only money damages, and the Court presumably intended to limit its inquiry to his specific request for compensatory relief using standard tort principles: Did Lesage suffer some material detriment, such as lost earnings or back pay, because without the racial classification he would have been admitted to the Ph.D. program at the University of Texas?[37]

Furthermore, the *Lesage* Court did not explicitly overrule, let alone cite, the *Carey* holding or discuss its implications to § 1983 racial discrimination claims. While it may be that *Lesage* augurs a jurisprudential shift away from *Carey* for equal protection claims or a limitation of *Carey* to procedural due process claims, it is not entirely clear from the Court's terse holding whether claims for nominal damages under § 1983 now require proof of an injury-in-fact, that a discrete governmental de-

---

**36.** A number of commentators discuss in detail the confusion that *Lesage* has added to standing doctrine in the equal protection context. *See* Sheldon Nahmod, *Mt. Healthy and Causation–in–Fact: The Court Still Doesn't Get It!*, 51 Mercer L.Rev. 603 (2000); Christina Whitman, *An Essay on Texas v. Lesage*, 51 Mercer L.Rev. 621 (2000).

**37.** To be sure, the *Lesage* decision plainly states that the "same-decision" defense goes to liability, rather than just to compensatory damages. *See id.* at 21, 120 S.Ct. 467 ("the government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability").

cision would not have been made without an impermissible criterion.[38]

I need not resolve the issue at this time because I cannot conclude as a matter of law that the Lynn defendants would have made the same decision regarding the plaintiffs' transfer requests absent the alleged racial classification. To be sure, on the basis of the present pleadings, it appears that before the Lynn Plan was ever implemented and absent extraordinary circumstances, the plaintiffs would have been obligated to attend their district school, irrespective of preference. *See* Affidavit of Superintendent Mazareas, January 28, 2000 [hereinafter "Mazareas Aff."] at ¶ 16 (prior to 1988, a parent's ability to obtain an exemption from Lynn's strict district-only assignment policy was "very limited" and granted, on those rare occasions, only after a petition and formal vote of the entire Lynn School Committee). In other words, the plaintiffs arguably *benefitted* from the challenged student assignment plan because it afforded an otherwise unavailable option to transfer.

Nevertheless, in a case as complex and socially-significant as this, this Court hesitates to make any final determinations without the benefit of a full-record.

Furthermore, in light of my previous discussion regarding the purposes and established precedent surrounding § 1983 law and until the Supreme Court injects some necessary clarity into the garbled area of standing law, I am inclined to adopt the narrower view that the *Lesage*

"injury in fact" holding does not govern standing to seek nominal damages in racial discrimination challenges. Therefore, as in ordinary section 1983 cases, to present a colorable claim a claimant need demonstrate only that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

■ Here, I find that the plaintiffs assert adequate proof of unequal treatment based on race, and therefore, under § 1983, have standing to seek nominal damages. *See Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 752 (2nd Cir.2000) (reversing a district court's granting of a preliminary injunction in part because, "[g]iven the procedural posture of the case" and "on the basis of the record thus far," the Appeals Court could not conclude whether the disputed program was narrowly tailored); *Boston's Children First*, 62 F.Supp.2d at 259 (whether a policy is narrowly tailored pivots on the factual specifics, i.e. how race is used, in what settings, for what purposes, whether it is race conscious or race preferential, whether the use of race excludes entirely or simply affects the distribution of a benefit, whether it is flexible, etc.); *see also Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir.1998) (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 343–44, 81

---

**38.** Two courts subsequent to *Lesage* did permit nominal or other damages despite the availability of the "same decision defense." *E.g. Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir.2000) (recognizing the availability of nominal damages for an equal protection violation, even absent an actual harm); *Hiller v. County of Suffolk*, 199 F.R.D. 101, 104 (E.D.N.Y.2001) (same with respect to damages for emotional distress). Of course, these cases did not actually address the *Les-*

*age* decision. One district court that did expressly consider the application of *Lesage* held the a plaintiff lacked standing to seek nominal damages under the "same decision defense." *See Tracy v. Board of Regents of the University System of Ga.*, 2000 WL 1123268 *9–10 (S.D.Ga.2000). On appeal, however, the Eleventh Circuit reversed the holding as to standing. *See Wooden v. Board of Regents of University System of Georgia*, 247 F.3d 1262 (11th Cir.2001).

S.Ct. 125, 5 L.Ed.2d 110 (1960) ("it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts")).

### 5. *Standing to Claim Declaratory Relief*

Consistent with this Court's previous discussion, the plaintiffs have standing to maintain this action for declaratory relief on three of their four grounds asserted. Specifically, because they have introduced enough evidence of past unconstitutional treatment, they have standing to petition this court under 28 U.S.C. §§ 2201 and 2202 to: (1) Declare that the defendants *violated* the plaintiffs' Equal Protection rights under the Fourteenth Amendment; (2) Declare that the defendants *violated* the plaintiffs' rights against discrimination via a program that receives federal funding under 42 U.S.C. § 2000d (Title VI); and, (3) Declare that the defendants *violated* the plaintiffs' rights by denying "admittance to a public school on the basis of race, color, national origin or creed" under Article III of the Amendments to the Massachusetts Declaration of Rights. *See Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir.1997) (where a party seeks declaratory

relief, standing inheres if the complainant can show that he suffered an invasion of a legally protected interest).[39]

However, the plaintiffs lack standing to seek a declaration of this Court that M.G.L. c. 71, § 37D *is* in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article III of the Amendments to the Massachusetts Declaration of Rights. As it is highly improbable that the plaintiffs will again be harmed by or even subjected to the allegedly unconstitutional transfer policies in question, they lack standing to seek prospective relief in the form of a declaration under 28 U.S.C. §§ 2201 and 2202 that challenges the constitutionality of the Massachusetts statute in question. *See Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir.1998) (when requesting forward-seeking declaratory relief pursuant to the Declaratory Judgment Act, a plaintiff must demonstrate a clear likelihood of future harm).

### B. *Plaintiffs' Challenge to M.G.L. c. 71, § 37D*

Because I find that the plaintiffs lack standing to seek prospective declaratory relief, I need not address whether their claim under 28 U.S.C. §§ 2201 and 2202

**39.** I note, however, that claims for alleged constitutional injuries that have already occurred and with no risk of recurrence are inappropriate for declaratory relief. The Declaratory Judgment Act provides a means by which rights and obligations may be adjudicated at an early stage before unnecessary damages accrue or injuries are exacerbated. *See, generally, 12 Moore's Federal Practice,* § 57.04[3] (3d ed.2000). However, the danger of avoidable damages passes with the conclusion of a finite episode of constitutional injury. *See Saum v. Widnall*, 912 F.Supp. 1384, 1394 (D.Colo.1996) (where the constitutional injury has already occurred and there is no threat of future harm, "the Declaratory Judgment Act is an inappropriate vehicle for asserting constitutional claims"); *Hoagy*

*Wrecker Serv. Inc. v. City of Ft. Wayne*, 776 F.Supp. 1350, 1359 (D.Ind.1991) (Act unavailable to tow truck operator asserting equal protection claim against city in connection with award of contract to other operators because purpose of Act was to prevent the accrual of avoidable damages, and these had already occurred); *Gruntal & Co., Inc. v. Steinberg*, 837 F.Supp. 85, 89 (D.N.J.1993) (declaratory judgment is inappropriate solely to adjudicate past conduct); *Boston v. Lafayette County*, 744 F.Supp. 746, 755–56 (N.D.Miss.1990), *aff'd* 933 F.2d 1003 (5th Cir. 1991) (declaratory relief unavailable in civil rights action arising from death of detainee where defendants immune from damages and no threat of future injury).

that section 37D of the Racial Imbalance Act violates the Fourteenth Amendment to the United States Constitution is cognizable.

Nevertheless, I reiterate only what I previously noted in *Comfort I*, that because M.G.L. c. 71, § 37D of the Racial Imbalance Act does not control the terms of the Lynn Plan that is the gravamen of this challenge, the "plaintiffs have taken aim at the wrong target." 100 F.Supp.2d at 62. Section 37D establishes the definitions which are referenced throughout the Racial Imbalance Act and provides for redress in certain, limited situations where a student's substantive rights, as defined by the section, have been violated.[40] The Lynn Plan, on the other hand, has been adopted voluntarily to qualify for additional state aid pursuant to the third, fourth, fifth, and seventh paragraphs of a *different* provision of the Racial Imbalance Act, M.G.L. c. 15, § 1(I).[41]

## IV. *CONCLUSION*

As the plaintiffs have not demonstrated that they face more than a theoretical possibility of future harm, they lack standing to bring a claim for injunctive or declaratory relief. However, accepting the veracity of their pleadings and drawing all reasonable inferences in their favor, I find that the plaintiffs allege facts sufficient to make out a claim of unequal treatment based on race and, therefore, have standing to seek nominal damages and limited declaratory relief.

Accordingly, the defendants' Renewed Motion to Dismiss [docket entry # 84] is **GRANTED** in part and **DENIED** in part. As it now stands, this Court will continue to exert jurisdiction over this action for the limited purpose of determining whether the plaintiffs are entitled to nominal damages and a declaratory judgment for having their rights abridged by the consideration of race in the Lynn transfer policies. **SO ORDERED.**

---

**40.** Specifically, section 37D relates only to the situation where a non-white student in a racially imbalanced school (more than a fifty percent non-white population) requests and is denied a transfer to a racially isolated school (less than a thirty percent non-white student population) or where a white student in a racially isolated school requests and is denied a transfer to a racially imbalanced school. Section 37D states that the school committee, if a seat is open at the receiving school, must accommodate the transfer, and if a seat is not open, must provide a *plan* to the Board describing how the school committee will accommodate the requested transfer as soon as practicable in the same academic year. If the Board is not satisfied with the proposed plan, it may implement a *mandatory plan* to accommodate the transfer.

**41.** M.G.L. c. 15, § 1(I) encourages the adoption of *voluntary plans* for the desegregation of local school districts by providing funding for transportation costs of student transfers, construction or renovation of facilities, magnet programs, and a specially created "Equal Education Improvement Fund." The plaintiffs appear to have confused the different "plans" referenced throughout the Racial Imbalance Act, as Lynn's "voluntary plan" is not a "plan" or "mandatory plan" as specifically defined in the third paragraph of section 37D.